We'll hear argument next this morning in Case 12-79, Chadbourne & Parke v. Troice in the Consolidated Cases. Mr. Clement. Mr. Chief Justice, and may it please the Court, the Stanford Ponzi scheme was a massive fraud, but that fraud clearly included material misrepresentations about transactions in covered securities. The complaints in this case bear that out. Plaintiffs allege specifically that their money was — there were misrepresentations about how their money would be invested in covered securities, that the misrepresentation was material, and that, indeed, the security of the underlying investments was the most important factor in securing plaintiffs' own investments in the C.D.s. I think there's some problem with whether or not this was covered securities, but I also think that's not in the case anymore. Am I correct on the latter assumption? Well, I certainly agree with you on the latter assumption, Your Honor, which is both lower courts decided this on the case, that the complaints specific — referred to covered securities specifically enough. I don't want to belabor the point because I don't think it's in the case, but I will say I do think there's a reason that that was not a contested issue, because if you think about the securities that were referred to, strong multinational  exchanges. Also, if you get into the details of the record, I mean, if you want to look at something, Joint Appendix page 746 is an attachment to the Willis complaint, and there, there's a reference to the New York Stock Exchange, and it's a translated letter to investors, and you could read it more than one way, but I sure think the whole point of that paragraph is to lead the plaintiffs to think that their stocks, they're buying an interest in stocks that would be traded on the New York Stock Exchange particularly. So if I'm trying to get a home loan and they ask you what assets you have, and I list a couple of stocks, and in fact, it's fraudulent, I don't own them, that's a covered transaction, that's a 10b-5 violation? Well, I don't know, Mr. Chief Justice. That would depend on the answer to a question that I don't think the Court has to decide in this case, which is whether a reference to your stock holdings would be sufficient to come with the need. And would you say you're going to pay off the loan by selling some stock holdings eventually? Yeah. I think that probably would be covered, Your Honor, and I don't think that's any great surprise. I mean, this Court held in a case called Rubin against the United States that if you pledge securities that are until the bank that they're valuable and they in fact aren't, that that's covered by the securities law. In that case, it wasn't just in connection with, it was actually considered a constructive sale or transfer of the securities. They were covered securities, right? I mean, you're pledging covered securities to the bank and make a misrepresentation about them, right? Well, that's right. I'm just saying, though, that I don't think the fact that you can have a misrepresentation in connection with a loan application or something like that is all that surprising in the sense that the way that both 10b, 10b-5 and SELUSA are structured, the in-connection-with requirement can take something that might otherwise be plain fraud, and if there's a misrepresentation in connection with a security or a covered security, that makes it security fraud. Breyer, my goodness, are there cases that where they brought such things? I mean, every State has laws that forbid fraud, and mortgages are probably, and loans are probably made in the billions every year. And all it takes is someone to say on his sheet of listing assets to have a covered security and say, don't worry, I'll hold these. I'll hold them. Or don't worry, I will sell this one and buy that one. Don't worry, I'll buy another one. I won't put up as security my sprinkler system. I will sell the sprinkler system and use it to buy a covered exchange. I guess if those fall within the securities laws, we would have expected to see billions of actions. Why not? With respect, I don't think in most of these cases anything is going to particularly turn on that. I also think I'm happy to answer your question. Breyer, I know that's what you think, but I need to know why you think it, if there are billions, if I'm right in my, what I just said. Because there are lots of cases where whether you can prosecute a fraud or a securities fraud is not going to make much difference. You can go at it either way. There are circumstances, there are really two things that are at issue here. One is the scope of the case. Just tell me a case where the SEC has ever, there may be such cases, but what it's done is somebody simply tried to get a loan, and he put on that sheet of paper listing assets, a covered security, and he said, I intend to keep it. Or he said, you know, I will buy some more, I'll sell it and buy some more, or, you know, put in your three things. Just list the case where they've ever prosecuted that as a securities fraud, or private people have. After all, it's beneficial sometimes for private people. What are the cases? Clements. Your Honor, I don't know that there are cases directly on point, but let me be clear. Our theory here does not by any means necessarily have to extend to those holder situations. What is at issue here is not just a misrepresentation about holdings of securities. It is there are misrepresentations about covered securities transactions, and more particularly, they are false promises to purchase covered securities for plaintiff's benefit. And there are SEC cases that are brought under those circumstances. And as well, there should be, because when you sell something, whether it's a non-covered security or something else based on a misrepresentation about covered securities, you trigger the interest of the SEC and SLUSA in a distinctly different way. Suppose that people reach a prenuptial agreement, and as part of the prenuptial agreement, they agree that in a year, one party to the marriage is going to sell as many shares of Google stock and buy a home with it. Is that covered by the securities laws now? Clements. I would think probably not at the end of the day, but I also would say that this is so far removed from that. I mean, first of all, Well, how is it removed from that? Because it has the same structural features, which is it's a misrepresentation about what you're going to do with securities that, in fact, does not affect any securities trading. What it affects is a decision to do something else, here to buy CDs or, in my example, to go get married. With respect, Your Honor, I think this Court has already crossed the bridge. You don't have to affect the specific transaction in which you are the fraud is alleged to be associated with. So you have cases like O'Hagan, for example, where the actual transaction on the exchange is not sullied with the fraud, and the victim of the fraud doesn't even trade. The holder of the confidential information But in all of our cases, there's been something to say when somebody can ask the question, how has this affected a potential purchaser or seller in the market for the relevant securities? And here there's nothing to say. With respect, I disagree with the premise. Somebody, not necessarily the victim of the fraud, but somebody has to have had some transaction in the market. It's the kind of misrepresentation that would affect someone in making transactions in the covered market. How would this do that? Well, the only way in which there isn't that kind of transaction here is because the fraud was bigger. As we point out in the briefs, if you imagine that this was a thing where they said, look, we're going to purchase multinational corporations, and instead they purchased domestic corporations, well, then there would be a transaction that would not have otherwise occurred on the market in domestic transactions that would have been perfectly analogous to the kind of normal transaction that took place in Bank of Life or in Zanford on the market, and yet the fraud was sufficiently associated with this. And I don't think this Court wants to say that the only frauds that are not in connection with are the really big ones. Breyer. But what is the case? What is the specific case, private or SEC, that comes the closest? I grant you there is none directly, but comes the closest to Justice Kagan's hypothetical, if you marry me, I will sell my IBM stock. I don't think there's a particularly close case, because, A, I think the SEC has better things to do. And I think private plainly has better things to do.   Roberts. They may be the SEC's closest case, but they may be better at answering this. They may be. What is their closest case to the horribles that they foresee if you lose? Well, I think probably I would start with the Richard Line case, which is cited on page 21 of their brief. And what that case shows is that you can have frauds in connection with covered securities that affect things that are either not covered securities or in that case are nothing at all. Mr. Line was very clever. He took people who were interested in having their kids go to college and needed financial aid, and he said, I'll take your assets from you, and they'll be mine. I'm not going to give you anything in return, not a covered security, nothing, because the whole point of this is to get your assets off your books. And what I'll do is I'll invest those in the market, make a bunch of money, and in four years, when you're no longer worried about financial aid, I'll return your principal and some of the proceeds. Alitoso, in Justice Kagan's hypothetical and in some of the others, it seems that it's really irrelevant whether the assets in question are securities or some other asset. And it's also, and therefore a fortiori, it's irrelevant whether — if it involves securities, whether they're covered or they're not covered. Now, would you be willing to concede that in that situation where it really — all you're talking about is an asset. It doesn't matter whether it's a covered security or a Rembrandt or gold, that in that situation, 10b doesn't reach the case? I think that — I would agree with that, Justice Alito, but for a slightly different reason than you may be imagining, which is I think one of the mistakes that can be made here is to ask in connection with do all the work. And the statute has multiple requirements, including a materiality requirement. And as your question suggests, if you're making a misrepresentation, and the whole point of it is to just tell somebody that, look, I have wealth or I have sort of assets, I don't know that the specific nature of them makes any difference. But in a case like this, the whole point of this fraud was to take a non-covered security and to imbue it with some of the positive qualities of a covered security, the most important of which being liquidity. And if you look at sort of the underlying brochures here that were used to market this, that's really what this fraud was all about. These CDs were offered as being better than normal CDs because we can get you your money whenever you need it. Alito, does it matter that there is not an allegation that there actually were any purchases or sales of covered securities? It says in — the statute says in connection with the purchase or sale of a covered security, and there weren't. I don't believe there's an allegation that they actually were purchased or sold. Does that matter? It doesn't matter, Your Honor, for the reason I indicated earlier, which is you don't want to draw a line that basically says, look, if you buy different securities than you were supposed to or you sell fewer than you were supposed to, that's covered. But if you're a Madoff and you go all the way and simply lie about the whole thing and there never were any securities purchases at all, that that's somehow better. What's your best case on that? Well, I think, again, if you want to start with SEC adjudications, again on page 21, there's the Jett adjudication, where, again, there was a broker-dealer in that case, and they just made up the trades. They told their employer, you know, look how I've done, look at these great trades, and there just weren't any trades. And, of course, all of the Madoff cases or a substantial number of the Madoff cases fit that categorization. It's actually not clear whether this case does, because at the end of the day, I think what's alleged is either there were no purchases or substantially less purchases of covered securities than represented. Nobody's really thought the difference between zero and substantially less made much of a difference in this case. And I would certainly, like I said, suggest that that's the right result, because whatever else is true, you can't somehow have a better fraud that's immune from the SEC just because you completely made the whole thing up and there were no transactions at all. Ginsburg. Ginsburg. There are, as Zanford said, that in connection with doesn't include every common law fraud that happens to involve covered securities. So can you give us an example of what would not be covered, what fraud involving securities would not qualify as in connection with the sale or purchase of securities? Clemente, let me start with, I mean, the hypothetical that Zanford used, because I think it helps illustrate why, even if coincide is the test, we satisfied here. What Zanford was really distinguishing is two cases, one where a broker-dealer gets money from a potential client with the purest of intentions, and only at a later stage do they say, you know, I'm kind of below in my own payments, I need some money, I'm going to embezzle the funds. And Zanford said in that context, the fraud and the security purchases are independent events. I don't think anybody would look at this case and say that the misrepresentations about covered securities purchases and the fraud were independent events. Nor would anybody say that this isn't a case where from the very beginning there was an intent by Stanford not to make good on the promise to purchase covered securities on behalf of the plaintiffs. So this is like Zanford itself or Wolf Holdings itself, where the fraudulent intent is there at the very moment the transaction takes place. And again, Wolf Holdings is another example where this Court says in dictum that, well, you know, it would be one thing if they sold the option and only later independently decided that they weren't going to perform on the option, but if they had that intent all along, they clearly coincide. Scalia. I had assumed that the purpose of the securities laws was to protect the purchasers and sellers of the covered securities. There is no purchaser or seller of a covered security involved here. It's a purchaser of not covered securities who is being defrauded, if anyone. Why would the Federal securities law protect that person? Well, a couple of things, Your Honor. First of all, obviously the Federal securities laws apply to non-covered securities as well as covered securities. So the real question here is going to be sluices coverage, because as I said, 10b-5 applies to non-covered securities. Second of all, this Court is well over the bridge about not requiring that it be the plaintiffs' own purchases or sales that are what the inquiry focuses on. And that's been true in a whole line of this Court's cases. Scalia. It doesn't have to be the plaintiff's, but it has to be somebody's. Well, and here there are purchases of covered securities. They are the alleged purchases. They are the false promises that I'm going to go to court with the plaintiff's  But they're non-existent purchases, right? Well, as I said, I don't think anything turns on it, but there actually were some purchases. I think the only element of fraud in there was by the bank itself. They're the only ones whose purchases or sales could be said to have been affected by the misrepresentation. And of course, they can't make any claim on that basis. Right, Mr. Chief Justice, and that's been the case in other cases as well. The security transaction in Banker's Life, neither the seller nor the buyer of those transactions had was affected by, directly by the fraud. In Zandford, there were security sales. Those security sales. But somebody else, somebody else was, right? Sure. And the plaintiffs were clearly affected by this fraud. Not by the purchase or sale, right? They were affected, according to your theory, by the fact that, well, they told us there were these stocks. But the actual purchases and sales, the fraud did not go to the purchases and sales of the covered securities, they went to the CDs. And again, that's true in so many of the cases. Dabbitt, it's the holders, didn't purchase or sell at all, but that was okay. O'Hagan, the defrauded party was the company with the confidential information. Your white light is on, but what is the simplest formulation of your test if we were to write the opinion your way, what the test would be? The simplest, narrowest way to decide this case is to say that when there is a misrepresentation and a false promise to purchase covered securities for the benefit of the plaintiffs, then the in-connection with standard is required. If I may reserve my time. Thank you, counsel. Ms. Goldenberg. Goldenberg. Mr. Chief Justice, and may it please the Court, we agree with the narrow formulation that Mr. Clement just gave. The issue in this case is that it involves a false promise to purchase covered securities using the fraud victim's money in a way that they're told is going to benefit them, and that that is classic securities fraud. There were questions earlier about the country's fraud. Sotomayor, how broad is the word benefit, because that's really what this case comes down to? Well, I think Assuming we accepted your narrow test, which wouldn't address every situation that the other circuits have talked about, but let's wait for it to open. I think it's clear that benefit isn't restricted merely to ownership of the securities themselves, and I would point to the fact that the benefit is restricted to ownership. Well, that was the Madoff situation, which was different than this one. Well, I don't think the Madoff situation is particularly different from this one. In Madoff, there were feeder funds that people were buying into that were non-covered securities, and what they were being told is that the money that was being put into the feeder fund was then going to go on and be used to purchase covered securities that they themselves were not going to have an ownership interest in, but that the benefit of those purchases was going to be passed back to them through this intermediate layer. Breyer. But the case that he said, this is — I'm quite interested in your reaction to which cases that you've ever brought. This would, if you lose here, would prevent you from bringing, and Line was the one that was mentioned. Yes. In Line, there is a broker who says to a client, give me some money and I'll buy some securities on the exchange for you. And they gave him the money and he didn't. Well, that's directly related to a promise that is going to affect a purchase or sale of a security directly. He's promising someone to buy securities for his account. I don't think that that's this case. I actually think the Line case is much more analogous to this case than Your Honor is suggesting, because what was happening in Line is that what the broker said to the victims was, you have children who are going to college, you don't want to have this money around because you want to be able to get financial aid, so give the money to me and in several years I will give that money back to you with the exchange. You didn't say, I will buy them for you, and I can understand how a promise to buy securities for you is a promise to a person or a statement that will lead a person to take a position, whether it's this plaintiff or someone in the world, it will lead someone in the world to take a position. What your opponents say is that is what is present, not present here. Neither the person who is giving the money nor anyone else, with the possible exception of the defendant, is being led by this statement to take a position in a market for, buy, against, sell, or even, if you like, not sell or buy, hold. I'll throw that in. Your Honor, just to return to Lyon for a moment, and then I'd like to address sort of how the purposes of the securities laws are implicated in a situation like this. In Lyon, what the victims were told was that they were going to be given the money back after 4 years had passed with interest calculated above market rates. So they are not being told that they are going to be given whatever profit is made on securities transactions, or as I read Lyon, although it's slightly sparse on its facts, that they are going to be the owners of the securities or have an ownership interest in any way. And so I do think it's cases like Lyon that are at the margins. Scalia, anyway, Lyon is not a case of ours, is it? No, it's not. It's not a case of any court, is it? It is an SEC. 20-year cases. Yes. Right. We don't have to agree with all of your cases, do we? Certainly not. Although we do think that the SEC's expert view in a formal adjudication may warrant some deference. But. Kagan, but suppose I think that the correct test is something along the lines of what you just said, is, is this the kind of representation that could affect somebody's doesn't have to be the victim of the fraud, it can be somebody else, but that could affect somebody's decision to buy or sell or hold covered securities. Can you satisfy that test? Yes, I think so, because I think that here there is a major effect on investor confidence, and investor confidence specifically with respect to covered securities in several different ways. If people see that lies of the kind here, where someone is telling someone else I'm going to buy covered securities and it's going to benefit you, are being made and those lies are, well, that's a fraud on the victims, then I think people are less likely to go to their broker and say, here's some money, go out on the market and buy me some securities. It's a lie that goes to the mechanism by which the securities markets operate, which is the purchases and sales. And it makes it less likely for people to be willing to believe that when they engage in purchases and sales, that something is really going to happen and the person is going to expunge. Kennedy, if you went to church and heard a sermon that there are lots of people that are evil, maybe then you wouldn't invest. Well, but this is much more particular, again, to the mechanism by which the securities markets operate. And I think another way to look at it is just to imagine the honest version of Stanford. If someone honestly said to CD purchasers, give me your money and I'm going to put it into covered securities, and people invested in that scheme, then that would pump money into the covered securities markets. But now people are much less likely to invest in a scheme like that. Well, but nobody is suggesting that the SEC can't take action with respect to the non-covered securities. So to the extent there's diminished confidence in the securities markets, the SEC has all the tools available to address that. The question is the different one under SLUSA. Well, I think it's true that the SEC would continue to have tools, but I do think that this would inspire confidence to the extent that lawyers can bring these actions, as opposed to having them precluded, which is what you're arguing for. I'm sorry, I interrupted. No, that's fine. I think that this is a very particular effect on investor confidence and the integrity of the markets, which is one of the purposes of the securities laws, and with respect to SLUSA, the purpose of SLUSA is to try to stop people from going around the requirements of the PSLRA and some of the limitations in this Court's decisions. And I think that purpose is at issue here as well. I'd also like to talk a little bit, if I could, about the issue that was raised earlier about whether an actual purchase or sale needed to be made or whether a purported or intended purchase or sale is sufficient. And I think that practically from the moment that the 33 and 34 Act went into place, there's been a consensus in the lower courts, and the SEC has said this as well, that a purported or intended purchase or sale is sufficient. And it's for the reason that Mr. Clement gave, that otherwise you have these home run, egregious frauds where someone is, instead of saying I'm going to buy this less risky thing and then buying a riskier thing, someone says I'm going to buy securities and then doesn't buy them at all and absconds with the money, and that that is something a situation that has to be, has to be covered. Alito, could I take you back to the test that you think we should apply here? The test that Mr. Clement articulated and that you agreed with seems to amount to saying when exactly what is alleged here is alleged, that that's within, that's within 10b, 10b-5. That's not that helpful as a precedent going forward. Now, the test that Justice Breyer suggested, whether something would affect investors' confidence in the securities market, I don't know how we can, and you say, yes, that would be met here. I don't know how we can determine what, whether something certainly of this nature or maybe even further removed would affect, would affect investor confidence. I mean, somebody might read about this scheme in the paper and say, well, you know, there's a lot of hanky-panky going on with the sale of any kind of securities and CDs. I'm just going to keep cash under my mattress. How do we, how would we determine that? Well, I think it's for the reasons that I gave earlier, which is that this goes to the purchase-sale mechanism, and that we know that people have to have confidence in that order, in order for the securities markets to work. It may well be that people also, you know, lack confidence in other things, but that is the thing that's the particular problem and the thing that the securities laws are aimed at. And I know Petitioner is saying that. Scalia What troubles me, Ms. Goldberg, is not the problem of our figuring out these economic consequences, but the text of the statute which says, in connection with the purchase or sale of one of the covered securities. There has been no purchase or sale here. Goldberg Well, there's been a purported purchase. Scalia But it doesn't say it's been in connection with a purchase or sale that has never occurred. I mean, it could have read in connection with the purchase or sale, or the promised purchase or sale, or the contemplated purchase or sale, but it doesn't say, it says in connection with the purchase or sale. I don't know how you can make that stick to a situation where there has been no purchase or sale. Goldberg That's true, Your Honor, but it also doesn't say the consummated purchase or sale. And so I think the purported, intended, consummated, all those things are swept up in the text. And I think that's consistent with the way that you would use the phrase in ordinary life. If I were going to go to my real estate brokers to sell my house, I might gather up a bunch of documents, I might show up at the office at a certain time in connection with the sale of my house, and even if the sale falls through and there is no consummated contract, I've still done those things in connection with the sale. And as I say, I think courts and the SEC have consistently taken that position, and if it weren't, if that weren't the case, then egregious frauds would go unremitied, and that would be a tremendous problem. Roberts Thank you, counsel. Mr. Goldstein. Goldstein Mr. Chief Justice, and may it please the Court, I'm going to ask you to write an opinion affirming that adopts the following rule, and that is that a false promise to purchase securities for oneself, in which no other person will have an interest, is not a material misrepresentation in connection with the purchase or sale of covered securities. The other side has asked you to adopt a rule that has never been advocated by the SEC in any other proceeding. It's never been advocated, as I understand it, in its briefs in this case. It's never been adopted by any court ever. And I think there are good reasons for that. Their theory is that what happened here is that there was a promise to buy covered securities that would be for the benefit of someone else. That has two textual flaws. It doesn't comport with the purpose of the statute, and it would have extraordinary consequences. It doesn't conform to the text of the statute in either of two ways. Covered security, which is what the plaintiffs here purchased, is a defined term. It is a security, but only the subset of securities that are traded on a national exchange and some other additions that involve, for example, mutual funds. And so Congress didn't say that it was in connection with the purchase or sale of a covered security if it was a covered security that someone else would get the benefit of. It is what has to be bought here is a stock, and instead what was bought here was a CD. As Mr. Clement says, this is a case of a massive fraud. He could well have said this is a case of a massive securities fraud. But it was not a case of a covered securities fraud. The plaintiffs here bought something that Congress specifically excluded from preclusion under SLUSA. The second textual flaw in their position is that the first textual flaw is. What is the jumping off point for this flaw? The jumping off point is that there is a defined term, covered security. So SLUSA only applies if there was a material misrepresentation in the purchase or sale of a covered security. Alito, the case proceeds on the assumption that the CDs were not covered securities. The question is whether it's the in connection with requirement is met by the allegation which is interpreted to mean that there would be future purchases and sales of covered securities. So I'm not sure what you're getting out of the fact that covered securities is a defined term. Because Congress asked you or told the courts to focus on the question of what the product is, that there was a misrepresentation in the course of the transaction, in the course of the purchase or sale. And that is only a covered security. It is not some other product that has as a benefit an interest in a covered security. Alito, it doesn't say a misrepresentation about covered security. It says a misrepresentation in connection with. That's actually, I think, Your Honor, a really good point for us, because the other side's argument up until the brief — excuse me, up until the oral argument is that it was a misrepresentation about covered securities that would trigger SLUSA. The problem with their position is that what the Court has always said when it talked about the definition of in connection with is really two things. It has to be flexible. We have to give the SEC the ability to deal with novel frauds. But because metaphysically everything is connected with everything else, we're going to have to draw a line. There's going to have to be some limit. And you've pointed out that it's not an easily administered one. But the bulwark, the one thing that stops 10b-5 from getting completely out of control is that all of the frauds involved are ones that the Court has recognized would have an effect on the regulated market. That was true in O'Hagan. It was true in Zanford. Now, I realize that my friend from the Solicitor General's office said today at the podium that they can imagine that this fraud would have an effect on the regulated market. They did say the opposite in their briefing in the case. Their brief at the cert stage said there was no possibility that there would be an effect on the regulated market. And so this, I imagine — Can you just give me the page for that? Yes, sir. It is — I'll get it during the — it's quoted multiple times in our brief. But my colleagues will get it if you don't mind. And it's in the cert stage about page 12, I think. But we'll — I'll have it for you in just a moment, please. And they said there is no — to quote it almost verbatim, there was no prospect that this fraud would have an effect on the covered securities market. The second textual flaw is — And if that — if that's wrong, you acknowledge you don't win? No, I do not, sir. Okay. But — What difference does it make? Well, it is a — as I understood, they seem to recognize, and if you were to read, for example, their brief in Zanford, they say that the sine qua non of their ability to determine as the enforcement authority here that something has — is in connection with the purchase or sale of the regulated security is whether it would have an effect on the regulated market. They wrote a brief to you saying that. And you really don't agree with that anyway? I think that that is their best hope, and I don't think they can satisfy it. We think their authority is narrower still. What is your position if the broker says, give me $100,000 and I will buy covered securities, and then he just pockets it and flees? That is securities fraud, in our view, according to the SEC's administrative position. No court has ever said that, so that's Justice Scalia's point from the first half hour. We can — if that is correct, if the SEC is correct about that, we still prevail, because what's happening is the broker is saying, I will purchase for you the covered securities. That's what the Lyon case stands for. Their brief in Zanford. Well, I don't see how this case is that much different. They say, we were going to invest in CDs, and the CDs will be backed by purchases of securities that we will purchase for you. Okay. So the critical difference, I think, is in the definition of purchase, and that was going to be the second textual flaw that I was going to point out, and that is we can acknowledge that they would have a much stronger case in the hypothetical that you've described if the covered securities are pledged to back the CDs. This happens, for example, in a margin account. It happens if there are lots of times someone will say, I intend to use your money to buy covered securities, to buy stocks, and I'm providing those stocks as security for the loan. The reason that's securities fraud is the definition of a purchase includes pledging the — pledging the stocks. That's really important, and it tracks with the court's holding that in connection with, reaches as far as frauds that would have an effect on the regulated market. Imagine if I were allowed to say, look, I'm going to buy covered securities, and you now hold an interest in them, an enforceable interest in the stocks. And if that were not securities fraud, the market couldn't function very well, because things like margin accounts, you could never have the confidence that you would have the protection of 10b-5. The critical difference, Justice Kennedy, is between two different cases. If S — this case, which is SIB, says, look, among all of its many misrepresentations, I will take your money and I intend to buy covered securities, that gets, you know, putting all aside the difficulty of liquid assets versus covered securities, give them their best version of the representation here. But it was only buying it for itself. It did not pledge to sell the assets. It did not give the plaintiffs any interest in them. For example, the interest rate on the CDs was completely independent of the return on those covered securities. Ginsburg. Mr. Goldstein, I take it from what you said up to now that you are not defending the Fifth Circuit's test, the call for a determination whether the misrepresentation is the heart or the crux of the complaint. We do defend that rule. We do not think it's the best ground to decide the case, and I will explain what I mean by that. The Fifth Circuit undertook to articulate a rule that would govern all cases in which someone purchased something that was supposedly invested in covered securities. So including, for example, the Madoff cases where there was securities fraud. Madoff falsely sold interest in a fund. That's core securities fraud. SIB never sold any securities at all. It only sold CDs. So if the Court believed that the Fifth Circuit was correct, that it was appropriate to decide all of these derivative investments, if I could, cases, then we think you need a flexible term like more than tangentially related. But we think this case stands on its own on the question of, look, if I promise — if I sell you something and I say I'm going to take the money and buy CDs for myself, and those CDs have the quality of being liquid, now, you don't have an interest in the CDs, I'm not pledging them to you, so there's no purchase by you of a covered security, then that's not securities fraud. And I did want to get to the point where I'm told by the government, you were trying to say — I know that Justice Scalia doesn't think it's important, but I do, okay? If someone tells me, sell your securities, give me the money, I will buy securities for myself and give you a fixed rate of return later, I think that's in connection with the purchase and sale of securities, even though it's not legally purchased for my benefit. Shanmugamer Okay. Two things about that, Justice Sotomayor. I will say that if what I think you were actually told from the podium is that it is unclear from the SEC's administrative opinion whether the persons who gave the money to the broker as an investment were actually given an interest in the securities. It's just not clear from that opinion. There's certainly no SEC holding. Sotomayor Let's assume they were. Shanmugamer Okay. Then the second thing I would say is the SEC has always been very clear to you that the key part of your hypothetical is that it's a broker. And the SEC has said to you repeatedly, and I will just give this to you from their Zanford brief at page 23, there's a particularly strong connection between fraud and securities transactions when stockbrokers, like Respondent, misappropriate securities and securities proceeds from brokerage accounts. The key feature is that you can understand why it is that the market can't function if your stockbroker is making promises about buying and selling securities. This is a bank. This is a bank that doesn't issue covered securities in any way because it's a foreign bank. It issues only the non-covered securities that Congress specifically excluded. Breyer I think why it's difficult to define. Jay Fisk gets into his horse and carriage, drives up and down Wall Street and says, I'm going to buy Union Pacific. I'm going to buy Union Pacific, knowing that people will, in fact, all run out and buy it quickly. And what he really intends to do is when it comes out he didn't, he's going to sell it. Anyway, typical fraud. Now, that's certainly covered. Goldstein, So now here, what we have is Mr. Stanford, I guess, saying to people, I'm going to buy securities, I'm going to buy securities, and maybe he didn't. Just like Jay Fisk. Goldstein, Sure. Okay. So why does the first fall within and not the second? Goldstein, Because the first completely messes up the stock market and the second one has nothing to do with it. The first Breyer In other words, if they had done exactly the same thing, but with an intent or, or maybe and the effect of a purchaser of stock or a seller of stock reacting to the statement, then it affects it. Goldstein, Absolutely, because that's the tip one off. Breyer Okay. Where neither of those is present, it doesn't. Goldstein, That's right. And if not, just Sotomayor, could you go back to the Madoff case, because you portrayed it as investors joining into funds that directly held stock, and I thought that it was more complicated than that. Goldstein, Okay. I will play it out. That was not my intention. The Madoff cases involve the following scenario, and there are diverse ones, and so I caution the Court about trying to lay down a rule that will govern all of those. So Madoff engages in securities fraud, and covered securities fraud. He says, I have this fund, it is invested in stocks. That turns out to be completely untrue. So we know that Madoff engaged in securities fraud. The Madoff cases are about the next generation, the indirect purchasers, and that is people who bought into a fund, and the fund bought into Madoff. Now, those cases have been resolved on two separate grounds that may not be entirely consistent, neither one of which has any implications for our case. Theory number one, and this is in an opinion by Judge Rakoff just a few weeks ago for the Second Circuit, he says, look, the indirect purchaser cases are covered by SLUSA, because I look at SLUSA, and it says, look at the allegation. And the core allegation in those cases is of covered securities fraud. It is that I was deceived, I lost my money, I should say, because Madoff engaged in securities fraud. He was selling air. He wasn't selling anything at all. That's not this case. SIB sold only non-covered securities. The second way they have been resolved is that you may be said to have, when you bought into what are called the feeder funds that in turn invested in Madoff, you may well have purchased an interest in the Madoff fund itself, and therefore, you were engaged effectively in the purchase or sale of covered securities. That is clearly on the other side of the line. From this case, nobody contends that we bought anything other than non-covered assets. Now, I have tried to get to the hypotheticals that the Court put to the my friends in the first half hour, and realize that these are not the case. Roberts. I'm sorry, I just got about 30 seconds behind you. Nobody contends that you bought anything other than non-covered assets? Correct. I thought there was an allegation that you were purchasing and selling covered assets, the ones that were misrepresented to be backing the CDs. No, sir. They have not even made that argument. They say that it's enough to trigger SLUSA that SIB bought something that was said in some sense, and I have no idea what the rule is, to be for our benefit or to back our CDs. But the only – it is categorically the case that the only purchase or sale by plaintiffs Oh, it was SIB. Yes. Yes, sir. Now, this is, of course, a significant step further than the line that already concerned some members of the Court, Justice Scalia, Justice Thomas, and the late Chief Justice dissented in O'Hagan. And this is a very significant move further than even that case, because the emphasis of the SEC in O'Hagan was that that kind of fraud would have a tremendous effect on the market if people didn't – couldn't be confident that the other – the person on the other side of the trade had material, nonpublic information. Now, returning to the hypotheticals that the Court put to my friends in the first half hour, realize they're not hypotheticals. They are exactly why the SEC is in the case. The SEC doesn't administer SLUSA. It is concerned that a narrower reading of in connection with will affect its ability to administer the securities laws. But you put to the SEC the question, okay, name a case that you've brought in the past 80 years that you could not bring if the plaintiffs prevail here. Name a case that you hypothetically want to bring. Breyer, that's exactly what I would like you to think about for a second, because the last words of Mr. Goldenberger of the SEC, well, if you win, it's going to seriously hamper the SEC in combating fraud. Of course, it wouldn't in a case like this, because they aren't limited by covered securities. They can deal with any security, and they did bring a case here. But they're worried about what you said, that somehow this will narrow their authority. And they quote Line, which is debatable. But assuming that it's debatable, and, you see, I want Mr. Clement will have a chance to answer this exact question. And so you are saying there are none, and Line is debatable, and therefore it would not have hampered them in any case in the past, nor anyone we're likely to think of in the future, but for Line, which is somebody's decision over at the SEC, and can be argued that it fits within your definition. Is that really your answer, or are we going to discover Mr. Clement coming up and saying you forgot about da, da, da, da? If he does, it will be the first time. They filed three merits briefs, three reply briefs. The SEC filed a cert stage amicus brief. It filed a merits amicus brief. It has argued orally in front of you. And so far, we haven't found a case. Now, can you — can I tell you that I can imagine a case that, because of my rule, the SEC can't bring? I can, and I think that they shouldn't be allowed to bring it. I'm not saying that our rule has no effect on them. I'm saying it does, but it's the lending cases, it's the prenuptial cases, it's those things that hang over the economy like a loaded gun. Ginsburg-Ginzburg Aren't those rather academic, because SLUSA wouldn't be a bar to them anyway, because they're not class actions. Shanmugam My point, Justice Ginsburg, I apologize, is not that those are affected by — that rule affects SLUSA. It affects the SEC's ability to bring a felony prosecution, despite the rule of lenity, on the basis that that's securities fraud. The — really understanding the consequence of this case, I'll admit to you that the effect on SLUSA, this is kind of a one-off case. They haven't identified any other cases like this under SLUSA. So they are adopting a very broad reading of inconnection to kind of kill a gnat. But the reason that they — the SEC wants to do it is because it wants an extremely broad reading of inconnection with the purchase or sale. They want to be able to bring a case in which someone is alleged to have purchased a non-security, a house, issued a loan, on the basis of some statement about the liquidity of the fraudster. And that is never a case that's ever been brought before. And so it's true that we would prevent them from doing that, but that's a good thing, not a bad thing. They've had 80 years to say that they need that authority, and they never have. If there is going to be a way in which we lose this case, notwithstanding the foregoing, I think it's going to be Justice Alito's concern, can you articulate a narrower rule in favor of the Petitioners that says it was the feature that they were covered securities that was essential to the fraud? I think we can say, first, that is not in the text of the statute, right? That those words don't appear. Alito, that's in the text of the statute, is in connection with, which is open-ended. So I don't know what you're going to get from the text of the statute. Well, I do think that this was not in connection with the purchase or sale. It certainly wasn't material to any purchase or sale. But the other thing, Justice Alito, is this notion that the feature of them being stocks was essential to the fraud would be true in, for example, a loan. If I say to you I want to get a loan for $100,000, I promise to buy for myself stocks that I could sell to repay the loan, the only thing that was critical about them is that they were liquid. And remember, that's actually all that SIB said, is that it had liquid assets. That's the only feature of it. And so if we're going to focus on that. Ginsburg. But you're not contesting at this point. I think both courts below assumed that the assets included stocks that would be traded on the exchange. You're not making the argument, it's not necessary, that maybe the portfolio included nothing that was traded on the exchange. We are not. I will say, however, that the other side has a serious problem of administrability of an opinion in its favor in the following way. Justice Ginsburg, the $7 billion in assets that SIB claimed to own clearly included some stocks on the NYSC. I think that's perfectly fair. The question is how many. Nobody knows the answer to that. And if you were going to rule for them, the lower courts are going to face cases where a bank says, we have liquid assets as well. Alito, could I just be clear on your position on the issue of whether there has to be an actual purchase or sale? Yes. What is your answer? Yes, there must be, or no, it's not essential? It is not essential to our position. If you agree with the SEC that there doesn't have to be a purchase or sale, we still easily win the case. No court has, I believe that's only been resolved administratively. And so you would have to decide that in their favor in order to win the case. In order to – we are not giving up on the issue. You don't want us to decide the case on that basis? No. You don't want us to issue an opinion that says there has to be a purchase or sale and therefore affirm? That is not the ground on which we have pressed the case in front of you. I'm not trying to make it more complicated. It is illustrative of all the rules that they need you to adopt that no court has ever adopted. Remember, on page 21 of their brief, which is what you're being pointed to, as their best cases, they point to three administrative proceedings, no court decision of a district court, court of appeals, or this Court, and it's only on the failure to purchase point. They have no cases in which the core features of this case are present, and that is you have a fraud that would not have an effect, they had previously said, on the regulated market whatsoever, and it's merely the fact that it's for the benefit of someone else. No court has ever adopted it. And picking up what this Court said was so important in Zanford and O'Hagan is that it has not been the SEC's position in the past. I know they have said it when they stood up today, but there the SEC assured you, for decades, we have taken this position, it's been essential to our enforcement priorities. Under Section 10b, this case is completely different. Alito, if we decided the case on that basis, it really would be a one-off. So the SEC today has told us this would have an effect on the securities market. But we would hold we won't listen to that because at an earlier point in the case, as interpreted by you, they said it wouldn't. So that would be the holding where, you know, because the SEC previously said it wouldn't be an effect on the securities market, that's the reason for the decision. No, sir. My point is not that when the SEC says it, it becomes true. We certainly don't agree with that. My point is that they haven't articulated, before they said the opposite and today they haven't articulated anything that is more than the kind of metaphysical go from here to here to here. And it asks too much when we start from a statute that carved these CDs out. Congress said we have this idea of a security. We have this idea from the National Securities Markets Improvements Act that the States regulate non-covered securities. And so we are going to say that the preclusive effect of SLUSA does not reach these things like the CDs that we leave to regulation by the States. So this case clearly falls very easily within the text of SLUSA as being not precluded. Then you ask, well, am I going to stretch the language of the statute to say, well, even though these are non-covered CDs, because securities were involved, I think SLUSA should still apply. And in asking whether you should stretch the language, you would say, well, what's the point of the phrase in connection with? Why did Congress give it that kind of capacious reading, but didn't say fraud about securities or fraud involving securities? It did say in connection with. And what your precedents have said over and over and over, and what has been the dividing line that has prevented 10b-5 from swallowing all fraud, is that these are misrepresentations that affect the regulated market negatively. These — this fraud did not do that, if there are no further questions. Thank you, counsel. Mr. Clement, you have 4 minutes. Thank you, Your Honor. A couple of points. First of all, it is just simply wrong that courts have not decided that a purported sale is covered. The GRIPO case from the Eleventh Circuit, which we cite in both our opening and reply brief, is one of those cases. There are others consistent with the SEC's longstanding position. Sanford is a case like that. There was a Congressified case from this Court that essentially says that as well. Would you, among all the circuit courts, which test would you adopt? I don't know that I would adopt any of them, Your Honor, because I think a lot of them make the same mistake, which is they get materiality and they sneak it into the in-connection-with requirement. Except Judge Sutton in the Sixth Circuit. Yes. And I think if you were going to accept one test, I would ask you to have the Siegel test from Judge Sutton. But I do think it's a mistake to have materiality or causation slip into the in-connection-with requirement. I'd like to start with Justice Kennedy's very apt observation that this fraud here is very similar to the paradigmatic securities fraud, where I simply — a broker simply says, give me your money, I'll buy securities, and never does. And from the perspective of the defrauded party, it doesn't matter whether what they get in return is a statement that says they own some securities, or a statement in a feeder fund that says they have an interest in the Madoff fund, or whether they get here a CD that they are told by the brochure that tells them what this is all about, that it's backed by the investments in the securities. They're all one and the same. Another thing I have to correct is it's simply not true that the returns here were not variable on the performance of the portfolio. It's not really well-developed in the record here, but if you want to, we could lodge the brochures that are used to market these things. They tell these guys that their returns are variable and that they could lose all of their principal because of the investments in covered securities. A second thing is, of course, Mr. Goldstein correctly says there are particular problems when broker-dealers lie about covered securities. Well, so, too, there are particular problems when an unregistered investment company lies about covered securities. And that's what their own complaint says was the reality of these of the Stanford Investment Bank, that it was an unregistered investment company. That's interesting for two reasons. One, if it were a registered investment company, all of its securities would be covered securities. That's another way you can get within the covered security ban. So this idea that Mr. Goldstein proclaims this is not a covered securities fraud is simply wrong. It is. It was material to this fraud to make misrepresentations about purchases of covered securities. Without those representations, that we're going to take their money and we're going to reinvest it, again, words from their complaint, in covered securities, nobody is going to give their money to a bank in Antigua. The reason you give your money to a bank in Antigua is because you think it's backed by something more than a piece of paper, and the something more was purchases of covered securities on the market. Ginsburg. Even if you're right about that, Mr. Clement, they also said there was a representation that this is insured by Lloyds, and there was another claim that they made. So even if you're right, wouldn't the answer be, okay, drop anything that has to do with in connection with the sale or purchase of securities. We have a claim about the insurance, and we also have a claim that both Antigua and the United States were heavily regulating. Those were false. Why couldn't they have a complaint shorn of the incorrect premise and based on the insurance and the regulated aspects? Clement. If I can answer, first of all, I think that Mr. Goldstein was quite prudent to not defend the Fifth Circuit's rationale. So the fact that there are other misrepresentations should not mean that a misrepresentation in connection with the purchase or sale of covered securities is somehow okay. SLUSA makes clear that a misrepresentation is enough. Now, the other thing I would say, very briefly, is that they may have an opportunity to try to replead. That, in a sense, is the next case. I assure you that we would be arguing here where the essence of their claim is to hold the Petitioner secondarily liable for the underlying misrepresentations. They have to sort of take them all, but that's the next case. Thank you, Your Honor. Thank you, counsel. The case is submitted.